**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

ANDREW ROY REYNARD,           :
                                   :
        Plaintiff,        :
                                   :
        v.                    :    Case No. 2: 14-cv-00252
                                   :
CAROLYN W. COLVIN,            :
COMMISSIONER OF SOCIAL     :
SECURITY ADMINISTRATION    :
                                   :
        Defendant.        :

## Opinion and Order

Plaintiff Andrew Reynard appeals the decision of an Administrative Law Judge (ALJ) denying his September 27, 2011 applications for Title II social security disability insurance benefits and Title XVI supplemental security income (SSI) benefits. Mr. Reynard alleges that he became unable to work on June 9, 2011. Administrative Record (hereafter "AR") 296. In particular, Mr. Reynard stated on his initial application that he has difficulties sitting and walking for any extended period of time and that he has difficulties resting. AR 253. With respect to his mental state, Mr. Reynard stated that he has childhood onset of Post-Traumatic Stress Disorder (PTSD), that his PTSD affects his ability to get along with others, and that he does not socialize much because he has difficulties trusting other people. AR 259-260. He also stated that he has a limited

1

attention span and that he forgets spoken instructions easily. AR 258. On his reconsideration application, filed after Mr. Reynard's girlfriend attempted suicide, the plaintiff alleged increased anxiety and depression stemming from trauma triggers. AR 274. In support of his application, Mr. Reynard submitted abundant evidence of his physical and emotional conditions and of their effects on his ability to work.[1] His application was initially denied on February 7, 2012 and denied on reconsideration on April 18, 2012. Mr. Reynard requested a hearing before an ALJ, who denied Mr. Reynard's application on May 28, 2013. The Social Security Appeals Council denied Mr. Reynard's subsequent request for review, and Mr. Reynard appealed to this Court on November 21, 2014. ECF No. 3. Because the records from the Plaintiff's health care providers persuasively demonstrate the Plaintiff's disability, the Court now reverses the ALJ's decision and remands solely for the calculation of benefits.

---

[1] Specifically, Mr. Reynard's administrative record includes years of medical records from his primary care doctor, Dr. Lippman; psychological records from his treatment at Northeast Kingdom Human Services in 1996, 2009 and 2011-2012, as well as with his most recent therapist, Gretchen Lewis in 2012-2013; records of treatment for a sleeping disorder at the Northern Vermont Center for Sleep Disorders; records from multiple attempts at physical therapy; and records from spine, pulmonary and neurology specialists. In addition, he presented functional capacity evaluations conducted at the request of his primary care doctor and by his therapist, as well as records from the Vermont Division of Vocational Rehabilitation. At the request of the Social Security Administration, the plaintiff's file also includes an evaluation by non-treating psychologist dated 1/27/12, and his disability determination explanations include mental residual function evaluations conducted by Drs. Ethan Atkins and Joseph Palatano and physical residual function capacity evaluations conducted by Drs. Donald Swartz and Geoffrey Knisely.

## BACKGROUND

Mr. Reynard is a 48-year old male who has been diagnosed with Post-Traumatic Stress Disorder (PTSD), depression, anxiety, severe obstructive sleep apnea, morbid obesity, chronic obstructive pulmonary disease (COPD) and degenerative disc disease and compression fractures in the lower back. The plaintiff's physical impairments have caused him to have chronic lower back pain and reduced mobility, and his psychological impairments have produced a range of maladaptive symptoms affecting plaintiff's social functioning and energy level.

Nevertheless, the ALJ found that the plaintiff was not disabled under the definition of that term in the Social Security Act ("Act"). In reaching that conclusion, the ALJ applied a five-step sequential evaluation process established by the Social Security Administration for determining whether an individual is disabled. 20 C.F.R. §§404.1520; 416.920. The Second Circuit has "tracked this methodology … as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically

consider him disabled, without considering vocational
factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations,
the Commissioner then asks whether, despite the claimant's
severe impairment, he or she has residual functional
capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past
work, the Commissioner then determines whether there is
other work which the claimant could perform. The
Commissioner bears the burden of proof on this last step,
while the claimant has the burden on the first four steps."

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000).

Applying this approach, the ALJ first found that the
plaintiff was not engaged in substantial gainful activity. Next,
the ALJ found that the plaintiff had a medically determinable
impairment that is severe or a combination of such impairments,
such that the impairment limits the plaintiff's ability to
perform basic work activities. Specifically, the ALJ found that
the plaintiff had the following severe impairments: degenerative
disc disease, obstructive sleep apnea, obesity, COPD, an
affective disorder and an anxiety-related disorder. AR 19.

At the third step, the ALJ evaluated whether the
plaintiff's impairment or combination of impairments is of a
severity to meet or medically equal the criteria of an
impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.
The ALJ concluded that the plaintiff's impairments in this case
did not rise to the level of a listed impairment. With regard to

his physical impairments, the ALJ found that the plaintiff's
degenerative disc disease, which caused his lower back pain, did
not meet or equal the criteria of listing 1.04 because "there is
no evidence of nerve root compression characterized by neuro-
anatomic distribution of pain, limitation of motion of the
spine, motor loss accompanied by sensory or reflex loss, and
positive straight-leg raising, or spinal arachnoiditis, or
lumbar spinal stenosis resulting in pseudoclaudication." AR 19.
The ALJ did not consider the effects of obesity specifically on
the plaintiff's disturbance of the musculoskeletal system,
although he did consider it in relation to the plaintiff's
overall combination of impairments. The ALJ concluded that the
addition of obesity to the sum of his other impairments would
not result in a finding of disability under step three because
the plaintiff "remains fully weight bearing and does not have
abnormal neurological functioning." AR 19.

   With regard to the plaintiff's obstructive sleep apnea and
COPD, the ALJ found that the plaintiff's condition did not rise
to the level of those disorders listed under listings 3.09 and
12.02. He also found the plaintiff's conditions did not meet or
equal the criteria of listing 3.02. Section 3 of the appendix
relates to respiratory disorders, including COPD, with 3.02
providing criteria for chronic respiratory disorders due to any

cause (with a non-relevant exception) and 3.09 providing criteria related to chronic pulmonary hypertension. Whether the severity of the impairment rises to the level of a disability is determined by specific test results related to (in relevant part) pulmonary artery pressure, forced expiratory volume or forced vital capacity. Section 3.00(P)(2) provides that sleeping disorders will be evaluated under the listings of the affected body systems, and 12.02 provides criteria relevant to neurocognitive disorders. The ALJ's conclusions regarding the limited impact of plaintiff's sleep apnea on his cognitive functioning and mood disturbance cross-references his evaluation of the evidence pertinent to plaintiff's other psychological disorders.

With respect to the plaintiff's psychological impairments, the ALJ determined that the plaintiff's anxiety and depression did not meet or equal the criteria in listings 12.04 or 12.06. The ALJ failed to consider whether plaintiff's PTSD diagnoses meets or equals the criteria in listing 12.12. However, his analysis of the factors to be considered in listings 12.04 and 12.06 would also be applicable to the 12.12 analysis. Listings 12.04, 12.06 and 12.12 provide three categories of criteria (A, B, and C) and require that a claimant exhibit either sufficient Category A and B criteria or Category A and C criteria. Category

A criteria relate to the symptoms of the disorder itself, while
Category B criteria relate to a claimant's functioning and
Category C criteria relate to whether the impairment is serious
and persistent, requiring a claimant to rely on an ongoing basis
upon medical treatment, therapy, psychosocial supports or a
highly structured setting to diminish the symptoms or signs of
the mental disorder. The ALJ found that plaintiff did not have
marked limitations in at least two of the Category B criteria:
in the ALJ's view, he only had mild restrictions in activities
of daily living and in social functioning, moderate difficulties
with regard to concentration, persistence and pace and had
experienced no episodes of decompensation. AR 20. The ALJ then
found that Category C criteria for 12.04 were not met because
"there is no evidence in the record of repeated episodes of
decompensation, a current history of one or more years'
inability to function outside a highly supportive living
arrangement, or a residual disease process that has resulted in
such marginal adjustment that even a minimal increase in mental
demands or change in environment would be predicted to cause the
individual to decompensate." AR 20. The criteria were not met
for 12.06 because "there is no evidence in the record of a
complete inability to function independently outside the area of
the claimant's home." *Id.*

7

The ALJ did not specifically reference any of the medical evidence in reaching these conclusions in a summary manner, and relied solely on reports of the plaintiff's daily habits. AR 20. Instead, he cross-referenced his residual functional capacity assessment in explaining his determination of the degree to which Category B criteria were present. AR 21. In particular, at this stage of the analysis, the ALJ gave little weight to the evaluation of the plaintiff's therapist, Gretchen Lewis, because it was inconsistent with the evidence of the plaintiff's daily habits. AR 24. The ALJ did not analyze the consistency between Gretchen Lewis' evaluation and the records from social worker Krystal Cota's prior treatment of the plaintiff or the reports of psychiatric symptoms on his primary care physician's records. *Id.* Instead, the ALJ took note of the opposite conclusion in a one-time evaluation conducted by Dr. Theodore Williams. The lack of reliance on this medical evidence therefore guided the ALJ's conclusion that Mr. Reynard was not disabled under step 3 of his analysis.

After concluding that the plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ went on to conclude that the plaintiff had residual functional capacity to perform light work; that he could perform frequent climbing of stairs, ramps,

ladders, ropes and scaffolds, as well as balance, stoop, kneel, crouch and call; that he could follow 1-3 step instructions; and that he could sustain concentration, persistence and pace over 2-hour blocks within a typical workday and workweek. AR 21. Once again, with respect to the plaintiff's mental disorders, the ALJ based his assessment on evidence of Mr. Reynard's daily habits and a single evaluation conducted by Dr. Williams, and gave little weight to the available evidence from Mr. Reynard's treatment providers. With regard to his physical impairments, the ALJ gave little weight to the evaluation conducted by Mr. Coleman, an occupational therapist to whom Mr. Reynard's primary care physician, Dr. Lippman, had referred the plaintiff. He also found that the plaintiff's reports of his own physical capacity and pain limitations were not credible because they were "not entirely supported or consistent with the evidence of record." AR 22. This assessment of the plaintiff's residual functional capacity led him to conclude, based on the testimony of a vocational expert, that the plaintiff could perform past relevant work as it was actually performed, and that, in the alternative, there are other jobs existing in the national economy that he is also able to perform. AR 26. The vocational expert's testimony relied on factual hypotheticals posed both by the ALJ and by the plaintiff's counsel. AR 54-61. The ALJ's hypotheticals were based on his assessment of the plaintiff's

residual functional capacity. *Id.* As a result, the ALJ concluded that the plaintiff was not disabled within the meaning of the Act.

## STANDARD OF REVIEW

Review of disability determinations of the Commissioner of Social Security involves two levels of inquiry. *Baybrook v. Chater*, 940 F. Supp. 668, 672 (D. Vt. 1996). First, the Court must decide whether the Commissioner applied the correct legal standard. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987). If the ALJ did not properly apply the correct legal standards, the court will remand the case for agency reconsideration unless the application of the correct legal principles could lead to only one conclusion. *Johnson*, 817 F.2d at 986.

The Court must then determine whether the ALJ's decision is supported by substantial evidence. *Id.* at 985. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401 (1971). The Court must consider the whole record, and that which detracts from the weight of the evidence must be considered in determining whether substantial evidence supports the findings. *Williams v. Bowen*, 859 F.2d 255, 258. The ALJ's decision need not "reconcile explicitly every conflicting shred of medical testimony" in order to be supported

by substantial evidence, but the ALJ may not unreasonably reject "all the medical evidence in a claimant's favor" in reaching her conclusion. *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983) (quotations and citations omitted). District Courts must "consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## DISCUSSION

1. <u>The ALJ committed legal error by failing to appropriately consider the effects of obesity</u>

The Plaintiff contends that the ALJ did not properly consider the effect of Plaintiff's severe obesity because he failed to evaluate the effects of obesity at steps 4 and 5 of the ALJ's analysis. As the ALJ noted, Social Security Ruling 02-1 establishes that an individual with obesity will be found to have an impairment that meets the severity of a listed impairment if he has an impairment that, in combination with obesity, meets the requirements of a listing. SSR 02-1p: Policy Interpretation Ruling, Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57859 (Sept. 12, 2002) (hereafter SSR 02-1); AR 19. However, the Rule also establishes that obesity may, by itself, be medically equivalent to a listed impairment. For example, "if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or

11

101.00B2b of the listings, it may substitute for the major
dysfunction of a joint(s) due to any cause (and its associated
criteria), with the involvement of one major peripheral weight-
bearing joint…" In addition, the rule provides that obesity must
be evaluated in assessing residual functional capacity in adults
when obesity is identified as a medically determinable
impairment, and requires residual functional capacity
assessments to consider "an individual's maximum remaining
ability to do sustained work activities in an ordinary work
setting on a regular and continuing basis." *Id.* A regular and
continuing basis is defined as 8 hours a day, for 5 days a week,
or an equivalent work schedule. The rule goes on to state that
"in cases involving obesity, fatigue may affect the individual's
physical and mental ability to sustain work activity. This may
be particularly true in cases involving sleep apnea." *Id.*

Here, the ALJ found that the plaintiff's obesity
constituted a severe impairment. AR 19. In addition, the ALJ
evaluated the effects of obesity to determine whether the
combination of plaintiff's impairments equals the severity of a
listed impairment. The ALJ concluded that although "morbid
obesity has been suggested by [the plaintiff's] treating sources
as affecting the claimant's overall condition…, he remains fully
weight bearing and does not have abnormal neurological

12

functioning." AR 19. The ALJ did not specifically consider the
effects of obesity on plaintiff's residual functional capacity
under step four despite having listed obesity as a severe
impairment under step two, in direct violation of the policy
stated in question 9 of SSR 02-1.

In addition, the fact that the plaintiff is "weight
bearing" and "does not have abnormal neurological functioning"
does not exhaust the necessary inquiry to determine whether the
combination of obesity and the plaintiff's degenerative disc
disease and compression fractures equals the severity of the
listed musculoskeletal impairment in 1.04. An impairment "is
medically equivalent to a listed impairment in appendix 1 if it
is at least equal in severity and duration to the criteria of
any listed impairment." 20 C.F.R. § 404.1526(a). Where a person
has an impairment is not described in Appendix 1, the
Commissioner is required to compare the claimant's findings with
those for closely analogous listed impairments, and find that it
is medically equivalent to the analogous listing if it is at
least of equal medical significance to those of a listed
impairment. If a claimant has an impairment that is described in
appendix 1, but does not exhibit one or more of the findings
specified in the particular listing, or exhibits all of the
findings, but one or more of the findings is not as severe as

specified in the particular listing, then the impairment is medically equivalent to that listing if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria. 20 C.F.R. § 404.1526(b).

The musculoskeletal listing identified by the ALJ, listing 1.04, provides specific criteria to determine that a disorder of the spine –including degenerative disc disease –resulting in compromise of a nerve root or spinal cord constitutes a disability. In particular, nerve root compression must be characterized by "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." In this case, the accompanying functional limitations were not initially met, even in the presence of obesity, because the straight leg raising tests tested negative, AR 400. However, a later report from November of 2012 identifies an absent right Achilles reflex and difficulty with single leg heel raising. AR 674. The plaintiff's records from his primary care provider indicate that at around this time, the plaintiff had experienced weight gain. AR 655. The reduced reflexes and increased

difficulties with leg raising over time suggest functional impairments of at least equal medical significance as those listed in 1.04 as the plaintiff gained weight after he filed his application.

In addition, a qualifying disorder of the spine includes spinal arachnoiditis and lumbar spinal stenosis accompanied by appropriate limitations of function. The spinal arachnoiditis must be "manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours" while the lumbar spinal stenosis must be "manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively."  While the plaintiff in this case did not have spinal arachnoiditis or lumbar spinal stenosis, the functional deficits required under these categories appear to be analogous to the plaintiff's reported and observed symptoms. Mr. Reynard primary care records described his pain as burning, and note that "the symptoms are aggravated by prolonged sitting" and "have been associated with leg weakness and paresthesias in leg". AR 402-404. Mr. Reynard alleged that he is unable to stand long enough to cook himself a meal, needs to change positions frequently and cannot walk for more than 10 minutes before needing to stop and rest. AR 282. Dr. Swartz' residual functional capacity assessment also states

that he has individual postural limitations. AR 73. His physical
therapy records show that "patient does have significant AB
motion and nerve flexibility limitations, as well as significant
LE weakness." AR 325. Dr. Coleman's Functional Capacity
Evaluation provides that the plaintiff's average standing
tolerance is approximately 7 minutes and his sitting tolerance
is 17 minutes. AR 677.[2] Therefore, the total effect of the
plaintiff's obesity on his ability to function appears to be of
equal medical significance as the functional criteria
established for the categories of disabilities in 1.04.

In addition, significant medical evidence suggests that the
plaintiff's obesity had an effect on both his sleep apnea and
his cognitive functioning. First, his increased lower back pain
resulting from his weight gain affected his ability to comply
with his treatment for sleep apnea. AR 637; 639. His treatment
providers for his sleep apnea consistently suggested that the
plaintiff's obesity contributed to his sleep problems, and that
plaintiff should focus on losing weight in order to reduce the
symptoms of this disorder. AR 315; 330-331; 415. Weight loss was
also encouraged to reduce his symptoms of COPD. AR 341. The
plaintiff's neurologist, Dr. Haq, found that "memory disturbance
and problem with word finding is most likely due to depression,

---

[2] The weight that Mr. Coleman's evaluation is entitled to and the credibility
of Mr. Reynard's statements are discussed further below.

sleep apnea" and also recommended weight loss as a mechanism to
reduce the plaintiff's sleep apnea and therefore improve his
cognitive functioning. AR 483; 488.

In short, the plaintiff's obesity was found by multiple
medical providers to aggravate the effects of his other
impairments. At a minimum, this medical evidence should have
been considered in the ALJ's evaluation of the plaintiff's
residual functional capacity. Although it is true that plaintiff
remained "weight bearing" and did not have "abnormal
neurological functioning," he experienced a wide range of other
functional limitations, including reduced cognitive functioning
due to sleep apnea, limited mobility, and postural limitations.
Considered as a whole, these functional limitations should also
have led to a determination that the plaintiff was disabled
because his limitations equaled the severity of impairments
listed in 1.04.

   2. The ALJ committed legal error by failing to properly
      evaluate evidence from Mr. Reynard's health care providers

   The plaintiff contends that the ALJ committed legal error by
failing to give appropriate weight to both the functional
capacity evaluation conducted by Mr. Coleman, the occupational
therapist that plaintiff's treating physician had referred him
to, and the evaluation of Ms. Lewis, the plaintiff's treating
therapist. The plaintiff does not argue that either Mr. Coleman

or Ms. Lewis are acceptable medical sources within the meaning of the Social Security Rules. Rather, he argues that the ALJ did not properly apply the factors relevant to determining the weight of other medical sources pursuant to Social Security Ruling 06-03. The Court agrees with the Plaintiff's argument and reverses the ALJ's decision for failing to properly weigh this evidence.

Social Security Rule 06-03 provides that "medical sources who are not 'acceptable medical sources'… have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p.; Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 71 Fed. Reg. 45593 (Aug. 9, 2006) (hereafter SSR 06-03). In deciding how much weight to grant such an opinion, the Commissioner must consider the following factors: how long the source has known and how frequently the

source has seen the individual; how consistent the opinion is
with other evidence; the degree to which the source presents
relevant evidence to support an opinion; how well the source
explains the opinion; whether the source has a specialty or area
of expertise related to the individual's impairment(s), and any
other factors that tend to support or refute the opinion. SSR
06-03.

   With respect to Ms. Lewis' evaluation, the ALJ recognized that
Ms. Lewis "does treat the claimant and is qualified to provide
an opinion regarding the nature and severity of his condition."
AR 24. However, the ALJ found that her opinion was inconsistent
with other evidence in the record, including the plaintiff's
ability to maintain romantic relationships and to keep up other
aspects of daily life. In fact, Ms. Lewis' statements are
consistent with the medical evidence in the record, including
the evidence stemming from Dr. Lippman's records. Dr. Lippman,
Mr. Reynard's primary care physician, is both a long-term
treatment provider and an "acceptable medical source." 20 C.F.R.
§§404.1513(a)(1); 416.913(a)(1). As such, evidence from his
records should be given great weight or controlling weight. 20
C.F.R. §§404.1527(d); 416.927(d). Beginning on March 28, 2011,
Dr. Lippman consistently listed the following symptoms in notes
about the plaintiff's psychiatric examination: loss of interest;

depressed mood; fatigue; sense of failure; indecisiveness; appetite change; weight loss; poor sleep (dreams a lot); irritability and anxiety; impaired cognitive function, inability to concentrate, insomnia, mood changes, nervousness and panic attacks. AR 405-406; 408; 418; 425-430; 433-436. After the plaintiff's girlfriend attempted to kill herself, Dr. Lippman's records indicate that "the course of depression has been increasing." AR 496. As a result, Dr. Lippman decided to start the plaintiff on an anti-depressant called Seroquel at Ms. Lewis' suggestion. AR 498. In this way, Dr. Lippman's treatment directly coincided with and in fact relied on Ms. Lewis' conclusions.

In addition, Ms. Lewis' statements about the plaintiff's conditions are consistent with the notes made by his previous therapist, Krystal Cota. She concluded that the patient struggled with PTSD and depression stemming both from childhood abuse and a traumatic accident that he witnessed as a truck driver. AR 605; 610; 619; 621. Ms. Cota also reported that Mr. Reynard presented as depressed and had "no skills to manage his depression." AR 620. Far from being able to engage with his romantic partners in a healthy way, he also had a history of unhealthy relationships that he had difficulty getting out of. AR 603; 604; 612; 613. According to Ms. Cota, Mr. Reynard also

had occasional mental health crises, including days on which he expressed "a desire to no longer be here," flashbacks to childhood abuse, and moments of "significant cognitive decline" due to emotional lows. AR 604; 606; 613; 619. In addition to these symptoms, Ms. Cota reported significant social difficulties, including panic attacks in public spaces that prevented him from keeping appointments, spending "most of his day purposely isolating himself to avoid other people," lashing out at others when triggered by memories of childhood abuse and difficulties in parenting his children. AR 621; 608; 613; 619.

Furthermore, both Ms. Lewis' reports and Ms. Cota's reports of the plaintiff's PTSD stemming from childhood abuse are consistent with his mental health records from 1996 and 2009. AR 309-311; 729-732. His 1996 therapist stated that patient was "a victim of severe physical and emotional abuse as a child" and that he had symptoms of post-traumatic stress and severe major depression. AR 729. In addition, the report states that, "in my clinical opinion Andrew is disabled and unable to work." *Id.* The 2009 records also state that the plaintiff has problems with recurring nightmares and that he "was abused and neglected as a child and that contributes to his struggles with trust." AR 731. They also describe in further detail the plaintiff's relationship difficulties with his ex-wife, explaining that this

21

experience caused the plaintiff to have "a hard time trusting people" and to become irritable and sleepless. AR 309. The records provide evidence of the plaintiff's difficulties functioning in a social setting, noting that "he expresses some challenges with irritation especially at work. He said that in that setting he feels that people look down at him…" AR 732. He also "admits to some paranoid thoughts. He often believes that people are 'talking about me, looking at me. It has something to do with trust issues. I feel trapped without my own space.'" AR 311. The 2009 records further indicate that plaintiff has "a lack of social supports" and needs to "work on coping skills and self-esteem". AR 310. Although these reports pertain to a different time period than the one for which Mr. Reynard is seeking disability benefits, it is significant that the general conclusions about the effects of the plaintiff's childhood abuse were consistent across time.

Finally, social security regulations require that, wherever possible, the commissioner "request longitudinal evidence of [an applicant's] mental disorder when [his] medical providers have records concerning [him] and [his] mental disorder over a period of months or perhaps years." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Subsection 12.00. If such longitudinal evidence is not available from a medical source, the Commissioner should request

it from other sources with the applicant's consent. Only in the
absence of longitudinal evidence will the Commissioner use
current objective medical evidence and all other relevant
evidence available to evaluate the applicant's mental disorder.
In this case, however, the ALJ failed to give any weight to the
plaintiff's two treating sources, who were able to provide
longitudinal evidence of the plaintiff's disorders, or to
evaluate their consistency with older records of the plaintiff's
mental disorder. Instead, the ALJ relied solely on non-medical
information about the plaintiff's daily habits and the one-time
report of Dr. Williams, who did not have a treatment
relationship with the plaintiff and could not provide
longitudinal evidence as required by the regulations. Dr.
Williams' conclusion that the "claimant is likely to experience
some difficulty engaging in some but not all activities
necessary for daily living given the mild nature of his current
mental health related problems" is clearly inconsistent with Ms.
Cota's reports of plaintiff's panic attacks and other notable
problems the plaintiff experienced in engaging with others in a
healthy way. AR 493.  Moreover, Mr. Williams' report appears to
rely on an incomplete picture of Mr. Reynard's mental health
situation: it states that, "he is not currently involved in
outpatient psychotherapy." AR 491. However, it is clear that Mr.
Reynard was in fact involved in therapy with Ms. Lewis at the

time. Therefore, Mr. Williams failed to incorporate relevant records from that treatment into his assessment.

Finally, it is worth noting that the ALJ gladly relied on Ms. Lewis' report in one way, without explaining why he was entitled to rely only on this portion of the report but not others. He noted that according to Ms. Lewis, the plaintiff was consistent in getting to his appointments and able to sustain his therapy schedule. The ALJ used this information to conclude that Mr. Reynard did not suffer from marked restrictions in activities of daily living. However, in reaching this conclusion, the ALJ ignored many other reports stating that the plaintiff had failed to keep appointments, screening the evidence in a selective manner to make a point that was unsupported by the record as a whole and inconsistent with Ms. Lewis' own clinical findings. AR 263; 475; 607; 613.

Similarly, the ALJ also discredited Mr. Coleman's residual functional capacity evaluation as inconsistent with the remainder of the evidence. He noted that clinical examinations "do not show significant functional deficits" and that plaintiff was "noted to have largely full strength, no neurological abnormalities or deficits, and a normal gait." AR 23.  Instead, the ALJ gave great weight to the April 18, 2012 opinion of the non-examining state agency consultant, Dr. Knisely. The

plaintiff objects that this opinion was issued prior to the production of significant relevant evidence stemming from treatment occurring after that date.

After applying the factors identified in SSR 06-03, the ALJ should have granted greater weight to Mr. Coleman's evaluation. Although Mr. Coleman was not a treating healthcare provider and did not know Mr. Reynard for an extended period, his opinion was, in fact, consistent with other evaluations of Mr. Reynard's physical functioning and was supported by an extensive physical examination. It was significantly more detailed than any other report of plaintiffs' physical movement capacity included in the record. Finally, Mr. Coleman specializes in precisely this type of evaluation: occupational therapists are commonly identified as experts in occupational functioning and receive a license from state authorities for this purpose.

In support of the ALJ's conclusion that the Coleman report is inconsistent with other clinical findings, the defendant points to medical records evaluating Mr. Reynard's musculoskeletal system. These records include a report from Dr. Gregory Walker, who evaluated the plaintiff for chronic mid-thoracic back pain; a physical therapy report from 2010; consultation records from a spine specialty center that examined plaintiff's back pain; and several neurology reports. However,

these evaluations were largely intended to determine the source
of the plaintiff's lower back pain, were not the product of an
evaluation of the plaintiff's functional capacity and therefore
are not necessarily in tension with Mr. Coleman's evaluation.
Thus, for example, it could be entirely consistent to find that
the plaintiff's gait was normal, but that his average standing
tolerance is only 7 minutes. It may also be consistent to find
that the plaintiff's reflexes are intact and that the plaintiff
has no neurological abnormalities, but that the plaintiff cannot
lift any amount of weight frequently or sit for more than 17
minutes because of his physical state. The records simply
measure different phenomena.

The most comparable records to the functional capacity
evaluation conducted by Mr. Coleman involve physical therapy
records, which attempt to evaluate the plaintiff's actual
capacity to engage in physical activity. Mr. Coleman's report is
consistent with these records, which provide that the plaintiff
"did not tolerate much aerobic [exercise]," that he has "AB
motion and nerve flexibility limitations, as well as significant
LE weakness", that plaintiff is "very deconditioned", and that
plaintiff reported significant pain after physical therapy. AR
322; 325; 338; 477. Dr. Lippman's records also note these
limitations: on February 2, 2011, the notes state that the

plaintiff's "range of motion has decreased and movements are painful". AR 398. Later records report that plaintiff became less active as his pain increased. AR 660-663. Although these records do not provide the same depth of analysis as Mr. Coleman's report, they certainly coincide with Mr. Coleman's general conclusions that Mr. Reynard experienced significant physical functional limitations as a result of his impairments as a whole, even if his underlying musculoskeletal disorder itself was relatively mild.

Therefore, the ALJ improperly discredited both Ms. Lewis' report and Mr. Coleman's evaluation, and the substantial evidence in the record to support both of these opinions about Mr. Reynard's physical and mental capacity. If he had taken these opinions into account, the ALJ would have had to conclude that the plaintiff was disabled under step three of the analysis. At a minimum, Ms. Lewis' account provides sufficient evidence to find that Mr. Reynard was disabled according to the criteria of listings 12.06, 12.04 and 12.15 (anxiety, depression and trauma-related disorders) and potentially 12.02 (neurocognitive disorders).[3] As noted in the discussion on obesity, Mr. Coleman's report provides evidence that the combination of Mr. Reynard's impairments equaled the severity of

---

[3] Ms. Lewis' report directly tracks the criteria of Category A, B and C factors under the relevant listings in section 12.00 of the Appendix.

listing 1.04. As discussed in greater depth below, even if Mr. Reynard were not found to be physically disabled at step three, however, Coleman's report would lead to the conclusion that he would not be able to perform past work or other jobs in the national economy.

3. The ALJ's credibility determination regarding the plaintiff was not consistent with applicable legal standards or supported by substantial evidence

The ALJ's assessment of plaintiff's residual functional capacity also discredited the plaintiff's own account of his impairments, particularly with respect to the effects of his lower back pain. Where supported by specific reasons, "an ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue,* 708 F.3d 409, 420 (2d Cir.2013). However, it is well established that where supported by objective medical evidence, a claimant's subjective evidence of pain is entitled to great weight. *See Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992). If a claimant's subjective evidence of pain suggests a greater severity of impairment than can be demonstrated by objective evidence alone, regulations require the ALJ to consider other evidence, such as the claimant's daily activities, duration and frequency of pain, medication, and treatment. *See* 20 C.F.R. § 404.1529(c)(3).

Thus, the Second Circuit has declined to uphold an ALJ's credibility determination where the ALJ did not sufficiently consider medical evidence supporting a claimant's allegations of pain. *Evans v. Colvin*, 649 F. App'x 35 (2d Cir. 2016). In *Evans*, the plaintiff's treating and consulting doctors had diagnosed the plaintiff with chronic back pain. "Several observed discomfort, tenderness, and a limited range of motion… [Two of her doctors] recommended additional measures to treat Evans's pain …, including steroid injections, a TENS unit, and physical therapy." *Id.* The Court noted that "these doctors seemed intent on treating [the plaintiff's] condition and relieving her pain; not one of them suggested that [the plaintiff] was exaggerating her symptoms." *Id.* Similarly, in this case, Dr. Lippman's records repeatedly provide that the plaintiff was in severe pain, recommend steroid injections and physical therapy and provide for medication for this pain. AR 363-365; 385-389; 393; 396; 402; 413; 437; 459; 595-598; 655-659. The spine center records also recommend injection therapy and provide that Mr. Reynard could participate in activities "as tolerated". AR 373-374.

Furthermore, the evidence that the ALJ considered to discredit the plaintiff's pain reports and reach the opposite conclusion about his functional level is unreliable. He pointed to one

state vocational rehabilitation case worker's account that she
had ostensibly seen the plaintiff walking around town with no
trouble. AR 25. However, the case worker never confronted Mr.
Reynard about this incident, and it is not certain that the case
worker in fact identified the right person or that Mr. Reynard
was not in pain when she saw him. AR 266. Moreover, the state
certificate of eligibility/ineligibility from that same office
notes that Mr. Reynard had difficulties standing for prolonged
periods and with motor functions. AR 268-269. Similarly, the ALJ
points to Ms. Lewis' statement that Mr. Reynard was riding his
scooter all over town to conclude that his physical impairments
were not as serious as Mr. Reynard had alleged. As with the case
worker, Ms. Lewis' account is second-hand, and it is possible
that Mr. Reynard would have provided additional details about
his limitations in riding the scooter or his pain if he had
related the incident directly. More fundamentally, however,
neither of these accounts come from medically acceptable
sources, and the ALJ's reliance on them despite their apparent
conflict with Dr. Lippman's records is inconsistent with the
legal standards described above.

Moreover, the ALJ's conclusion that Mr. Reynard's sleep
problems were due to poor sleep hygiene is inconsistent with the
voluminous records provided by the sleep clinic that treated the

plaintiff. It is true that at one point, when the plaintiff's
compliance with treatment improved and when his mental health
and back pain problems did not exacerbate his insomnia, Mr.
Reynard's sleep doctor stated that she thought "most of his
daytime functioning problems are now due to his very poor sleep
hygiene." AR 570. However, she also stated that "he is very much
ready to do the measures we discussed" to re-adjust his sleep
schedule after years of having altered sleeping patterns due to
other impairments. *Id.* Previous and subsequent records indicate
that sleep hygiene was not by any means the sole or principal
cause of the plaintiff's problems with sleep, and that his sleep
apnea, obesity, PTSD and lower back pain were all contributing
factors. AR 314-315; 637; 639; 641. Therefore, the ALJ's
citation of the sleep clinic records to identify the causes of
Mr. Reynard's sleeping problems was selective and not supported
by substantial evidence.

> 4. The ALJ's decision to deny benefits because of his
> conclusion that Mr. Reynard could perform the jobs he had
> previously held or adapt to other work was not supported by
> substantial evidence

Since the ALJ's residual functional capacity assessment at
step 4 relied on an incorrect weighing of the medical evidence,
his conclusions at step 5 were also flawed. If the ALJ had
relied on Mr. Coleman's assessment of the plaintiff's physical
abilities and on Ms. Lewis' assessment of his mental abilities,

he would have posed a different set of hypotheticals to the
vocational expert. With respect to the plaintiff's physical
abilities, the ALJ found that the plaintiff was capable of
performing a range of work at the light exertional level, that
he is limited to one to three step instructions, able to sustain
concentration and pace over two-hour blocks over a typical work
day and work week, and did not have difficulties interacting
with others. AR 21-25. As a result, he presented the testifying
vocational expert at the administrative hearing with scenarios
based on this level of physical functioning. In response, the
vocational expert testified that the plaintiff could perform all
past work except for construction. AR 54-55. When the ALJ added
the instructional and persistence limitations, the expert stated
that the plaintiff could perform past work as a janitor at a
light level and the flagger job, and that he may be able to
perform the taxi driver job. In addition, he could perform other
jobs that he had not previously held, including food and
beverage order clerk, cashier and retail marker. AR 55-56. The
ALJ based his conclusions on this section of the testimony.

However, when the vocational expert was asked by
plaintiff's counsel about a hypothetical individual with some of
the physical limitations that Mr. Coleman found Mr. Reynard to
have exhibited, he concluded that such an individual might be

able to perform the tasks required of a semiconductor bonder position only. AR 60-61. However, when asked about a hypothetical individual whose ability to work eight hours a day is questionable, the expert testified that only the food and beverage clerk would have such flexibility, therefore ruling out the semi-conductor bonder position. Finally, when asked about an individual with marked restrictions maintaining social functioning and concentration, persistence or pace, the expert testified that such an individual would not be able to perform any of the jobs listed above. AR 58-59. Mr. Coleman and Ms. Lewis' reports, as well as the evidence identified above as consistent with these reports, provide evidence to support the conclusion that Mr. Reynard could only perform the limited physical and mental functions that his counsel had presented as a hypothetical to the vocational expert. Therefore, the ALJ's conclusion about the range of work that the plaintiff could perform was not supported by substantial evidence.

## CONCLUSION

In light of the foregoing analysis, the Court finds that the ALJ did not correctly apply relevant legal standards in weighing the evidence in the record. In particular, the ALJ failed to grant appropriate weight to two critical reports that were supported by substantial medical evidence, including

evidence from the plaintiff's treating physician. Moreover, the ALJ did not adequately consider the effects of the plaintiff's obesity and erroneously discredited the plaintiff's own reports of pain and his resulting levels of functioning. As a result, the ALJ's conclusions about whether the plaintiff's impairments met or were medically equal to the criteria of an impairment listed in the appendix to the regulations, as well as about the plaintiff's functional capacity and his ability to perform work were not supported by substantial evidence. The Court has no basis to conclude that a more complete record might support the Commissioner's decision. *Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir. 2004). Therefore, the Court hereby finds that plaintiff is disabled, reverses the ALJ's decision and remands solely for the calculation of benefits. *See* 42 U.S.C. §405(g); *Butts*, 388 F.3d at 385–86.

Dated at Burlington, in the District of Vermont, this 2nd day of November, 2016.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge